IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

STUDIO FRAMES LTD., d/b/a          )
SOMERHILL GALLERY,                 )
                                   )
                    Plaintiff,     )
                                   )
v.                                 )          1:01CV0876
                                   )
STANDARD FIRE INSURANCE COMPANY    )
                                   )
                    Defendant.     )
_____ )

MEMORANDUM OPINION

TILLEY, Chief Judge

        This suit arises from a dispute between Plaintiff Studio Frames and

Defendant Standard Fire Insurance Company ("Standard Fire") regarding the

amount of flood insurance coverage available to Studio Frames.  This matter is

currently before the Court on Plaintiff's Renewal of Plaintiff's Motion for Summary

Judgment [Doc. #61] and Defendant's Motion for Renewal of Defendant's Motion

for Summary Judgment [Doc. #63].  For the reasons set forth below, the Plaintiff's

motion for summary judgment will be GRANTED and the Defendant's motion for

summary judgment will be DENIED.

I.

        Studio Frames is an art gallery that leased space at the Eastgate Shopping

Center in Chapel Hill, North Carolina.  The Eastgate Shopping Center is owned by

Federal Realty Trust Investments, Inc. ("Federal Realty"). Federal Realty maintained a flood insurance policy for $500,000, which covered the entire building. In September 1996, Studio Frames suffered flood damage as a result of Hurricane Fran. At the time, Studio Frames did not have flood insurance. To restore the business after the flood, Studio Frames obtained a disaster loan from the United States Small Business Administration ("SBA"). As a condition of the SBA loan, Studio Frames was required to purchase flood insurance in the amount of $194,700 to cover leasehold improvements and $287,200 to cover the contents of the gallery. In November 1996, Studio Frames purchased a Standard Flood Insurance Policy ("SFIP") from Defendant Standard Fire Insurance Company in these amounts.

Although the SFIP at issue in this case is sold and serviced by a private insurance company[1], the flood policy contains standard language written by the Federal Emergency Management Agency ("FEMA") and can be found in 44 C.F.R. Part 61, App. A(2) (1999), which is incorporated into the Code of Federal

---

[1]In 1983, FEMA promulgated regulations that provided for claims adjustment by private insurers operating as "Write-Your-Own" insurance companies ("WYO's"). 44 C.F.R. §§ 61.13(f), 62.23(a). Regardless of whether FEMA or a WYO issues a flood insurance policy, United States Treasury Funds are used to pay the insured's claims. See Gowland v. Aetna, 143 F.3d 951, 955 (5th Cir.1988); In re Estate of Lee, 812 F.2d 253, 256 (5th Cir.1987). WYO companies issue SFIP's in their own names. 44 C.F.R. §§ 61.13(f), 62.23(a). However, in order to maintain control over the provisions of the flood insurance policy, the government does not allow the WYO companies to alter the SFIP. 44 C.F.R. §§ 61.4(b), 61.13(d). FEMA regulations establish the terms of the SFIP, the rate structures, and premium costs. 42 U.S.C. § 4013.

2

Regulations by reference at 44 C.F.R. § 61.13(a) (1999). The Standard Flood Insurance Policy was created pursuant to the National Flood Insurance Program ("NFIP"). 42 U.S.C. § 4011 et. seq. Article 4 of the SFIP describes the type of property covered by the policy. Coverage A ("Building Coverage") under the policy is entitled Building Property and, subject to stated exceptions, includes the entire building as well as fixtures and other additions and extensions attached to the building. 44 C.F.R. Part 61, App. A(2), Art. 4 (1999). Coverage B ("Contents Coverage") under the policy is entitled Personal Property and, subject to stated exceptions, includes personal property which is in or on the fully enclosed building and belongs to the insured. The Contents Coverage also allows an insured who is not an owner of the building to apply up to ten percent of the amount of its Contents insurance to cover loss to leasehold improvements. Id. Studio Frames purchased Building Coverage in the amount of $194,700 to cover its interest in the leasehold improvements it had installed in its store. In addition, Studio Frames purchased Contents Coverage in the amount of $287,200 to cover the contents of the gallery.

On July 23 and 24, 2000, Studio Frames suffered another flood loss, including severe damage to its leasehold improvements and to the gallery's contents. After Studio Frames contacted Standard Fire to report the loss, an adjuster, Leo Soucy, arrived on behalf of Standard Fire to adjust the loss. In the course of his visit to the premises Mr. Soucy learned that Studio Frames leased,

3

rather than owned, the portion of the shopping center that housed its gallery and that Federal Realty maintained a federal flood insurance policy that covered the entire building. The adjuster informed Studio Frames that it was not eligible to receive any money for damage suffered to the leasehold improvements under the Building Coverage portion of the flood insurance policy because Studio Frames was a lessee and did not own the gallery space. Mr. Soucy explained that Studio Frames could make a claim for the leasehold improvements under the Contents Coverage portion of the policy in an amount equal to ten percent of the Contents Coverage. Consistent with Mr. Soucy's statements, Standard Fire attempted to refund to Studio Frames the premium it had paid for the Building Coverage, which Standard Fire now believed to be unavailable to Studio Frames as a lessee of the space.

On September 20, 2000, Studio Frames submitted a proof of loss to Standard Fire seeking $287,200, the policy limits, under the Contents Coverage of the policy. This proof of loss did not contain a claim under the Building Coverage portion of the policy and included the following language: "We believed that we had additional coverages available pursuant to [the policy] for a flood loss such as the one we have experienced. However, we were advised by [an insurance company] representative that we have no coverage for flood losses under these policies. We reserve the right to make claims under these other policies, including the right to claim losses not paid under this Proof of Loss." [Doc. # 26, Proof of

4

Loss, ex. 1, ¶ 6.]. In December 2000, Studio Frames submitted a second proof of loss for $143,336.27 under the Contents Coverage, the amount approved by the Standard Fire adjuster. To date, Standard Fire has paid $143,336.27 to Studio Frames under the Contents Coverage and has paid nothing under the Building Coverage.

On September 14, 2001, Studio Frames filed the current action alleging breach of contract and claiming $132,597.05 in leasehold improvements coverage and $172,083.73 in additional contents coverage. On April 2, 2003, this Court dismissed Studio Frames' claims at summary judgment. In its Memorandum Opinion, this Court barred Studio Frames from challenging Standard Fire's denial of coverage for the leasehold improvements because Studio Frames failed to file a proof of loss detailing the damage to the improvements. Further, this Court agreed with Standard Fire that under the Contents Coverage in the SFIP, Standard Fire's promotional materials were properly characterized as "valuable papers" and for that reason were not covered under the policy.

Studio Frames appealed this Court's judgment in both respects. On May 21, 2004, the Fourth Circuit reversed in part and affirmed in part. The Fourth Circuit affirmed the ruling on the SFIP's valuable papers exclusion, but reversed the ruling on the leasehold improvements issue finding that it was possible for Standard Fire to repudiate the SFIP Building Coverage. The Fourth Circuit found that if Standard Fire's refusal to provide Building Coverage under the SFIP amounted to a

5

repudiation of its policy to provide flood insurance, Studio Frames' failure to file a proof of loss was not dispositive of its claim. The Fourth Circuit remanded the case to determine whether Standard Fire in fact repudiated the policy by its actions. After remand, both the Plaintiff and the Defendant renewed their motions for summary judgment on the remaining issue of whether Standard Fire is liable to Studio Frames under the SFIP for coverage on the leasehold improvements.

II.

Summary judgment is proper only when, viewing the facts in the light most favorable to the non-moving party, there is no genuine issue of any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Cox v. County of Prince William, 249 F.3d 295, 299 (4th Cir. 2001). An issue is genuine if a reasonable jury, based on the evidence, could find in favor of the non-moving party. Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986); Cox, 249 F.3d at 299. The materiality of a fact depends on whether the existence of the fact could cause a jury to reach different outcomes. Anderson, 477 U.S. at 248; Cox, 249 F.3d at 299. Summary judgment requires a determination of the sufficiency of the evidence, not a weighing of the evidence. Anderson, 477 U.S. 242, 249 (1986). In essence, the analysis concerns "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251-52.

6

III.

The Fourth Circuit provided three points of guidance in considering whether Standard Fire's refusal to perform amounted to a repudiation of the policy. First, in determining whether Standard Fire repudiated the insurance contract, a refused performance "need not be express or dependent on 'spoken words' alone; it may rest on a defendant's conduct evidencing a clear intention 'to refuse performance in the future.'" Studio Frames v. Standard Fire Ins. Co., 369 F.3d 376, 383 (4th Cir. 2004) (citing City of Fairfax v. Washington Metro. Area Transit Auth., 582 F.2d 1321, 1327 (4th Cir. 1978)). Second, to find a repudiation of the flood insurance policy, Standard Fire must have been mistaken in its belief that the SFIP prevented it from offering Building Coverage to Studio Frames. Id. In other words, there can be no repudiation if Standard Fire were correct in its assessment that the SFIP does not provide coverage to the leasehold improvements. Third, if it is determined that Standard Fire was bound to provide coverage for the leasehold improvements under the SFIP, to amount to a repudiation of the flood insurance policy, Standard Fire's refusal to perform must be unequivocal and involve an obligation at the "very essence of the contract." Id.

During oral argument, Standard Fire did not dispute the first and third points raised by the Fourth Circuit. Mr. Soucy, the adjuster hired by Standard Fire to handle Studio Frames' flood loss claim, told Studio Frames that it had no coverage for leasehold improvements under the Building Coverage in the SFIP because it was

7

a tenant and did not own the building. (Pearsall Aff. ¶ 3; Richardson Dep. at 98-99). In addition to the adjuster's statements that the SFIP did not cover the leasehold improvements, Standard Fire attempted to refund the premiums paid by Studio Frames for the Building Coverage. (Richardson Aff. ¶ 18.) The undisputed evidence shows that Standard Fire unequivocally refused to provide payment for damage to Studio Frames' leasehold improvements under the Building Coverage of the SFIP. Furthermore, refusing to reimburse an insured for damage to insured property involves an obligation that is at the very essence of the insurance contract. Therefore, the sole remaining issue is whether Studio Frames was entitled to recover for damages to its leasehold improvements under the Building Coverage of its flood insurance policy.

Although Standard Fire does not dispute its refusal to provide payment to Studio Frames under the Building Coverage of the SFIP, Standard Fire argues that it did not repudiate the contract because Studio Frames as a lessee could not legally maintain Building Coverage. Standard Fire argues that there cannot be any coverage for the alleged damages to the leasehold improvements, other than that allowed by the ten percent rule set forth in the Contents Coverage of the SFIP. There is no dispute that Standard Fire paid Studio Frames the maximum amount allowed for leasehold improvements under the Contents Coverage. However, Studio Frames argues that it is entitled to an additional $132,597.05 under the Building Coverage.

8

The SFIP and all disputes arising from the handling of any claim under the policy are governed by the flood insurance regulations promulgated by FEMA, the National Flood Insurance Act of 1968, 42 U.S.C. §§ 4001-4129, and federal common law. <u>Suopys v. Omaha Property & Cas.</u>, 404 F.3d 805, 807 (3rd Cir. 2005).

Nowhere in the SFIP does it state that a tenant cannot purchase Building Coverage for its property interest in leasehold improvements. Standard Fire does not point to anything in Article 2's "Definitions" nor in Article 3's "Losses Not Covered" that says that a tenant cannot insure leasehold improvements. Furthermore, Standard Fire does not dispute that Studio Frames' leasehold improvements meet the SFIP's definition of "improvements." Nonetheless, Standard Fire argues that paragraph E of the Contents Coverage prevents a tenant from purchasing Building Coverage and that paragraph W of Article 8 prevents a tenant from purchasing Building Coverage. Finally, Standard Fire argues in the alternative that even if the SFIP theoretically allows a tenant to purchase Building Coverage, the statutory coverage limits found at 42 U.S.C. § 4013(b)(4) prevent Studio Frames from purchasing Building Coverage in this particular case.

A.

Under federal common law, the construction of flood insurance policies is governed by general insurance principles. <u>Battle v. Seibels Bruce Ins. Co.</u>, 288 F.3d 596, 607 (4th Cir. 2002). In <u>Hanover Bldg. Materials, Inc. v. Guiffrida</u>, 748

9

F.2d 1011 (5th Cir. 1984), the Fifth Circuit Court of Appeals identified several

"standard insurance law principles" that were applied in interpreting a flood

insurance policy: (1) "if the language of a policy is clear and unambiguous, it

should be accorded its natural meaning"; (2) in determining whether an ambiguity

exists, the contract should be "reasonably construed consonant with the apparent

objective and intent of the parties"; (3) "in deciding what a reasonable construction

of the contested provisions is, the material we may draw from consists of those

provisions, the policy as a whole, and the apparent objectives of the parties in

establishing this kind of contractual relationship"; and (4) "if the meaning of the

policy terms remains in the end unclear, the policy is generally construed in favor

of the insured in order to promote the policy's objective of providing coverage." Id.

at 1013 (internal citations omitted).

Standard Fire first argues that the section of the Contents Coverage which

allows for some leasehold improvements coverage is a cap on a tenant's ability to

recover for leasehold improvements. Paragraph E of the Contents Coverage

provides:

> The Insured, if not an owner of the described building, may apply up
> to 10% of the amount of insurance applicable to the personal
> property covered under this item, not as an additional amount of
> insurance, to cover loss to improvements to the described building
> which have been made, or acquired, at the expense of the Insured
> exclusive of rent paid by the Insured, even though the
> improvements are not legally subject to removal by the Insured.

44 C.F.R. Part 61, App. A(2), Art. 4, Coverage B, Paragraph E. After citing this

10

section of the SFIP, Defendants conclusively state that no other coverage is available for leasehold improvements under the SFIP. While this section of the SFIP unambiguously provides Studio Frames with one way to at least partially insure its leasehold improvements, the language does not prevent an insured from using Building Coverage to supplement the coverage of its leasehold improvements if necessary.

The language of the Building Coverage explicitly includes coverage for fixtures as to which coverage is not provided for under Contents Coverage. 44 C.F.R. Part 61, App. A(2), Art. 4, Coverage A, Paragraph 3. In fact, Standard Fire does not argue that Building Coverage does not cover improvements made to real estate, instead it argues that tenants are not allowed to buy Building Coverage because tenants are allowed to recover for some leasehold improvements under Paragraph E of Contents Coverage.

The language appears to unambiguously support Studio Frame's argument that Paragraph E in no way precludes a tenant from purchasing Building Coverage. Furthermore, even if the language could be considered ambiguous, standard insurance law principles require any remaining ambiguities to be construed in favor of the insured, and therefore, require reading Paragraph E as not preventing a tenant from supplementing its coverage of leasehold improvements by purchasing Building Coverage. Standard Fire fails to produce any standard of insurance law that would support interpreting a policy provision that allows partial recovery under

11

one type of coverage, to have the effect of preventing full recovery under a

different type of coverage. Certainly, none of the standard insurance law principles

cited above would support such an interpretation.

B.

Standard Fire next argues that it cannot provide Building Coverage to a

tenant whose landlord already carries an SFIP for the same building because of the

SFIP's prohibition of duplicate policies. The duplicate policies provision appears in

Article 8 entitled General Conditions and Provisions and it reads as follows:

> Duplicate Policies Not Allowed: *Property may not be insured under more than one policy issued under the Act*. When the Insurer finds that duplicate policies are in effect, the Insurer shall by written notice give the Insured the option of choosing which policy is to remain in effect, under the following provisions:
>
> 1. If the Insured chooses to keep in effect the policy with the earlier effective date, the Insurer shall by the same written notice give the Insured an opportunity to add the coverage limits of the later policy to the those of the earlier policy, as of the effective date of the later policy.
>
> 2. If the Insured chooses to keep in effect the policy with the later effective date, the Insurer shall by the same written notice give the Insured the opportunity to add the coverage limits of the earlier policy to those of the later policy, as of the effective date of the later policy.
>
> In either case, the Insured must pay the pro rata premium for the increased coverage limits within 30 days of the written notice. In no event shall the resulting coverage limits exceed the statutorily permissible limits of coverage under the Act or the Insured's insurable interest, whichever is less.
>
> The Insurer shall make a refund to the Insured, according to applicable National Flood Insurance Program rules, of the premium

12

for the policy not being kept in effect.

44 C.F.R. Part 61, App. A(2), Art. 8, Paragraph W (emphasis added).  Standard Fire specifically points to the text stating "Property may not be insured under more than one policy issued under the Act."

However, Standard Fire's arguments fail to account for FEMA's use in Paragraph W of the word "property" instead of the word "building."  The duplicate policies prohibition does not state that a building may not be insured under more than one policy.  Instead it says that "property" may not be insured under more than one policy.  Standard Fire does not dispute that Studio Frames has a valid insurable interest in the leasehold improvements in its gallery.  Nor does it make any claim that Federal Realty's Building Coverage included any coverage for the leasehold improvements which Studio Frames is currently seeking recovery.  A landlord and a tenant can, and in this case do, have different property interests and different insurable interests in the different components of a leased building. Studio Frames' Building Coverage is not a duplicate policy because it insures different property interests.

A reading of the entire duplicate policies provision makes clear that the SFIP is concerned with a single "Insured" having duplicate policies covering the same property, and the provision provides a method of remedying that situation if it arises.  Because Standard Fire does not allege that Studio Frames has more than one SFIP on its leasehold improvements, this provision is not relevant to whether a

13

tenant can purchase Building Coverage to insure its leasehold improvements. The plain language of this provision in no way prevents a tenant from purchasing Building Coverage to insure his own property interests; that coverage is explicitly available under Building Coverage.

Therefore, no language in the SFIP prevents Studio Frames from purchasing Building Coverage to insure its property interest in leasehold improvements.

C.

Finally, Standard Fire argues that Studio Frames' claim is specifically barred by the National Flood Insurance Act because, according to Standard Fire, the Act prohibits any insurance coverage of more than $500,000 on any single structure. The statutory language at issue is 42 U.S.C. § 4013(b)(4) (2003) which provides:

> in the case of any nonresidential property, including churches, for which the risk premium rate is determined in accordance with the provisions of section 4014(a)(1) of this title, additional flood insurance in excess of the limits specified in subparagraphs (B) and (C) in paragraph (1) shall be made available to *every insured* upon renewal and every applicant for insurance, in respect to any single structure, *up to a total amount* (including such limit specified in subparagraph (B) or (C) of paragraph (1), as applicable) *of $500,00 for each structure* and $500,000 for any contents related to each structure . . .

(emphasis added). Standard Fire argues that the language "up to a total amount" limits the Building Coverage to an aggregate of $500,000 no matter how many insureds have an insurable interest in the structure. Because Federal Realty already maintains an SFIP with Building Coverage limits of $500,000, Standard Fire argues that in conformity with the National Flood Insurance Act, no further

14

coverage is available for the same structure under Studio Frames' policy. (Def.'s Mem. In Opposition to Renewal of Pl.'s Mot. For Summ. J. Ex. 1.)

1.

Although FEMA has not issued a regulation interpreting the exact statutory subsection cited by Defendants, FEMA has issued a regulation interpreting the identical language used in § 4013(b)(2). Section 4013(b)(2) limits the available coverage in residential property. The parallelism canon of statutory construction makes this interpretation of § 4013(b)(2) probative of the interpretation of § 4013(b)(4). In construing statutory text, there is a presumption that a given term has the same meaning throughout a statute. <u>Yi v. Fed. Bureau of Prisons</u>, 412 F.3d 526, 531 (4th Cir. 2005). That subsection provides:

> in the case of any residential property for which the risk premium rate is determined in accordance with the provisions of section 4014(a)(1) of this title, additional flood insurance in excess of the limits specified in clause (i) of subparagraph (A) of paragraph (1) shall be made available *to every insured* upon renewal and every applicant for insurance so as to enable such insured or applicant to receive coverage *up to a total amount* (including such limits specified in paragraph (1)(A)(l) of $250,000. . .

42 U.S.C. § 4013(b)(2) (emphasis added). The statutory text does not distinguish between single dwelling residential property and multi-dwelling residential property. Similar to Standard Fire's reading of § 4013(b)(4), this text could also be read to place an aggregate limit of $250,000 on a multi-dwelling residential property no matter how many people have insurable interests in the structure. However, FEMA issued a regulation stating, "In the insuring of a residential condominium building in

15

a regular program community, the maximum limit of building coverage is $250,000 times the number of units in the building . . . ."  44 C.F.R. § 61.6 (2004).  Thus, FEMA did not interpret the language "up to a total amount" to place an aggregate limit on the amount of building coverage available on multi-dwelling residential property.

Although FEMA's interpretation of the statutory text receives deference, it must be reviewed by this Court.  In reviewing an executive agency's interpretation of a statute, it must first be determined whether the plain language of the statue addresses the precise issue before us.  "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."  Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-43 (1984).  However, if the statutory text is ambiguous in expressing Congress' intent, this Court must defer to an agency's reasonable construction of the statute.  Id. at 843-44.

In this case, the precise question is whether the statutory text places an aggregate limit on the amount of building coverage available to all people who may have an insurable interest in the structure.  To ascertain the Congressional intent a court reviews the language of the statute, the specific context in which that language is used, and the broader context of the statute as a whole.  Gadsby by Gadsby v. Grasmick, 109 F.3d 940, 952 (4th Cir. 1997).  Standard Fire contends that by including "up to a total amount" Congress plainly intended that the

16

coverage limit was an aggregate limit. Certainly Standard Fire's interpretation of the statute is plausible; however, the language does not unambiguously compel this interpretation.

The language "up to a total amount" could also have been included for a different reason. The purpose of 42 U.S.C. § 4013(b) is to provide certain limits to the regulations which FEMA creates respecting the amounts of coverage available to insureds. The coverage limits in § 4013(b) vary depending on whether the insured is receiving insurance under the subsidized rates of the emergency program or under the actuarial rates of the regular program. The emergency program is the initial phase of a community's participation in the NFIP and was designed to provide a limited amount of insurance at less than actuarial rates. See 42 U.S.C. § 4014(a)(2), 4015. Therefore, when an insured is receiving subsidized rates, § 4013(b)(1) provides smaller coverage limits than the limits provided in 4013(b)(2),(3), and (4). When viewed in this context, the language "up to a total amount" could reasonably be interpreted as necessary to ensure that the additional flood insurance coverage available under 4013(b)(2) and (4) is the amount stated ($250,000 and $500,000 respectively) and is not to be added to the amount originally available under 4013(b)(1). Because there are at least two plausible interpretations of the language "up to a total amount," the plain text of the statute is ambiguous.

Additional canons of statutory construction contradict Standard Fire's

17

interpretation of the language "up to a total amount" as well as support a finding that Congress' intent is ambiguous. One canon states that the omission by Congress of language in one section of a statute that is included in another section of the same statute generally reflects Congress' intentional and purposeful exclusion in the former section. NISH v. Cohen, 347 F.3d 197, 203-04 (4th Cir. 2001). When setting the coverage limit for business properties under the emergency program, the statute includes language stating "except that the aggregate liability for the structure itself may in no case exceed $100,000 . . . ." 42 U.S.C. § 4013(b)(1)(B). This statutory language clearly places an aggregate coverage limitation on the structure no matter how many people may have insurable interests in the structure. It is relevant in deciding Congress' intent that this language was not included in 4013(b)(2) or (4).

Another canon of statutory construction states that when the wording of an amended statute differs in substance from the wording of the statute prior to amendment, Congress intended the amended statute to have a different meaning. In 1994, § 4013(b)(4) was amended. The statute previously stated:

> in the case of business property owned, leased, or operated by small business concerns for which the risk premium rate is determined in accordance with the provisions of section 4014(a)(1) of this title, additional flood insurance in excess of the limits specified in subparagraph (B) of paragraph (1) shall be made available to every such owner, lessee, or operator in respect to any single structure, including any contents thereof, related to premises of small business occupants (as that term is defined by the Director), up to an amount equal to (i) $250,000 plus (ii) $200,000 multiplied by the number of such occupants which coverage shall be allocated among such

18

occupants (or among the occupant or occupants and the owner) in accordance with the regulations prescribed by the Director pursuant to such subparagraph (B), *except that the aggregate liability for the structure itself may in no case exceed $250,000* . . .

(emphasis added). When Congress amended § 4013(b)(4), not only did it change the dollar amounts of coverage available, but Congress also deleted the language that placed an explicit aggregate coverage limit on the structure itself. Congress' choice to delete this language which placed a clear aggregate coverage limitation on a structure is further evidence that the current statute was not intended by Congress to have such an aggregate limit.

Therefore, although Standard Fire argues for a plausible reading of the statute, the canons of statutory construction do not support a finding that Congress unambiguously intended the language "up to a total amount" to create aggregate coverage limitations.

Because the statute is ambiguous in expressing Congress' intent, the remaining issue is whether FEMA's interpretation of the statute is reasonable. An agency's interpretation receives deference from the court so long as it "give[s] reasonable content to the statute's textual ambiguities." Dep't of Treasury, IRS v. FLRA, 494 U.S. 922, 933 (1990). However, a reviewing court may not second-guess the wisdom of an agency's interpretation by substituting its own construction of the statutory provision for the agency's reasonable interpretation of the statute. Yi, 412 F.3d at 534. In this instance, FEMA's interpretation that the language "up to a total amount" does not place an aggregate limit on the amount

of coverage available to a single structure is a reasonable construction of the text. Accordingly, deference should be accorded to FEMA's construction of 42 U.S.C. § 4013(b)(2).

Relying on the parallelism canon of statutory interpretation, FEMA's reasonable interpretation of 4013(b)(2) also supports a finding that 4013(b)(4)'s text was not intended by Congress to serve as an aggregate limit of Building Coverage.

## 2.

Furthermore, being drafted by FEMA, the SFIP itself is an interpretation of the agency given authority by Congress to interpret the National Flood Insurance Act. See 42 U.S.C. § 4013. FEMA has been granted authority to establish the terms of the SFIP, the rate structures, and the premium costs – subject to the limiting terms of the statute. See id. As discussed supra, the SFIP allows a tenant to purchase insurance coverage for its leasehold improvements. The terms of the SFIP do not clearly contradict the plain language of 4013(b) and the terms are a reasonable interpretation of Congress' intent to provide flood insurance to certain flood-prone areas of the United States.

Therefore, the text of § 4013(b)(4) does not prevent Studio Frames from recovering for flood damage to its leasehold improvements under the Building Coverage policy it purchased from Standard Fire.

D.

In conclusion, Standard Fire repudiated its contract to provide flood insurance to Studio Frames' leasehold improvements when it refused to pay Studio Frames $132,597.05 for flood damage to leasehold improvements under the Building Coverage Studio Frames purchased from Standard Fire. The refusal to pay for the damage was unequivocal and went to the very essence of the contract to provide flood insurance. Further, Standard Fire was mistaken in its belief that the contract did not require it to pay Studio Frames damages under the Building Coverage. Because Standard Fire repudiated the flood insurance contract before Studio Frames was required to submit a proof of loss, Studio Frames is entitled to recover for damages to its leasehold improvements in the amount of $132,597.05.[2]

IV.

For the reasons set forth above, Defendant's Motion for Summary Judgment will be DENIED and Plaintiff's Motion for Summary Judgment will be GRANTED.

This the day of August 16, 2005

                                        /s/ N. Carlton Tilley, Jr.
                                        United States District Judge

---

[2]Studio Frames presented sufficient proof of the amount of damages, and Standard Fire has not contested the amount of damages suffered by Studio Frames.

22